## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|   |   |   |
|---|---|---|
| CHARLES FRAZIER, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| HENRY H. OTTENS MFG. CO., INC., | : | NO.   11-3987 |
| d/b/a OTTENS FLAVORS, and | : | |
| CHUCK JONES and ROBBIN NEJAD | : | |
| and GINO FABIONERI, | : | |
| | : | |
| Defendants. | : | |

### MEMORANDUM

BUCKWALTER, S. J.                                                         April 4, 2012

Currently pending before the Court is the Partial Summary Judgment Motion of Defendants

Henry H. Ottens Manufacturing Company d/b/a Ottens Flavors ("Ottens"), Chuck Jones ("Jones"),

Robbin Nejad ("Nejad"), and Gino Fabioneri ("Fabioneri"), collectively referred to hereinafter as

"Defendants."  For the following reasons, the Motion is denied.

## I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This matter involves a racial discrimination dispute between Plaintiff Charles Frazier

("Plaintiff" or "Frazier") and his former employer, Ottens.  Ottens is a food-flavoring company

headquartered in Philadelphia, Pennsylvania.  (Compl. ¶ 7; Answer ¶ 7.)  Plaintiff, an African-

American male, was hired by Ottens in May of 2007 as a "janitorial engineer."  (Compl. ¶¶ 13, 16;

Answer ¶¶ 13, 16.)  In this position, Plaintiff performed general cleaning and maintenance work at

the Sample Lab at Ottens.  (Pl.'s Resp. Opp'n, Ex. A., 01/16/12 Deposition of Charles Frazier

("01/16/12 Frazier Dep.") 71:19–24, 72:1–6.)   When he was hired, Frazier received Ottens's employee handbook and underwent training from the company's Human Resources Department, both of which addressed the company's harassment policy.   (Id. at 114:2–23; Defs.' Mot. Summ. J., Ex. 2, Ottens Flavors Employee Handbook ("Employee Handbook") 16.) Plaintiff was aware that the policy required him to report any incidents of discrimination or harassment to Ottens's Human Resources Department.  (01/16/12 Frazier Dep. 116:8–9; Employee Handbook 16.)  At all relevant times, Defendant Nejad was the Director of Human Resources at Ottens.  (Compl. ¶ 9.)

While employed at Ottens, Plaintiff claims to have experienced various incidents of racial discrimination.  In particular, Frazier claims that the management made several racial jokes and insensitive comments, often referring to maintenance personnel as "you people." (01/16/12 Frazier Dep. 32:2–12.)  Frazier claims the comments made him uncomfortable, but he never reported them to anyone in Human Resources.  (Id. at 38:21–24, 39:1–13.)

Frazier asserts that Defendant Fabioneri, his direct supervisor, was particularly discriminatory towards him.  (Id. at 71:11–12.) At one point, Frazier allegedly heard Fabioneri say, "N------- be rebellious or reluctant to be grateful for the jobs that they have."  (Id. at 45:21–22.)  Frazier, however, was unsure whom the comment was about or addressed to, and therefore did not report the incident.  (Id. at 38: 3–13, 45:12–17.)  Fabioneri also allegedly made a joke in Frazier's presence about tropical birds needing to get a suntan in order to resemble Frazier's skin tone.  (Defs.' Mot. Summ. J., Ex. 5, 09/14/11 Deposition of Charles Frazier ("09/14/11 Frazier Dep.") 71:11–17.)  At another point in time, after watching a television news report about the low employment but high crime rates of African-Americans, Fabioneri allegedly asked Frazier how he felt about people of his ethnic background committing such crimes. (01/16/12 Frazier Dep. 32:17–24, 33:1–10.)  Plaintiff

2

claims that he found the question discriminatory, (id. at 33:20), but again did not report it to Human Resources.  (Id. at 39:1–4.)

Sometime thereafter, Frazier applied for a job in the Ottens shipping department that was under the management of Defendant Jones.  (Id. at 38:4–8.)  Plaintiff was denied the position, and believes that Fabioneri was responsible for this action.  (Id. at 56:16–21.)  Moreover, when discussing the pay rate for the position, Jones allegedly told Frazier, "you people have . . . good benefits, you have this, you have that, and you're asking for more money." (Id. at 51:4–6.)  Plaintiff, however, was unsure whether the comment solely referred to African-Americans or to all lower-ranked employees with benefits, and therefore once again failed to report the incident.  (Id. at 39: 3–13, 51:9–14.)

Frazier further asserts that he was denied overtime because Fabioneri was biased against him, and alleges that he possibly may have been disciplined for working overtime at some point.  (Id. at 82:10–12, 85:7–16.)  When Frazier asked Fabioneri why he was denied overtime, Fabioneri allegedly told him that the extra work made Frazier too tired and affected his job performance the next day. (Id. at 82:13–15, 21–24.)  At her deposition, Nejad stated that Frazier had contacted her in her capacity as the Director of Human Resources because he was concerned about his ability to work overtime. (Pl.'s Resp. Opp'n, Ex. B, Deposition of Robbin Nejad ("Nejad Dep.") 59:10–11, 15–16.) Nejad testified that at the time of Frazier's overtime requests, there was a general, company-wide cutback on overtime at Ottens, and that Frazier's overtime hours in a different department would have conflicted with his shifts at the Sample Lab.  (Id. at 59:15–24, 60:1–24.)

According to Frazier, another alleged incident of discrimination occurred when he found a printout of an e-mail in the Ottens locker room that crudely discussed African-Americans and the

modern-day operations of the Ku Klux Klan ("KKK").  (01/16/12 Frazier Dep. 106:3–20; Defs.'
Mot. Summ. J., Ex. 4, 12/17/2007 E-Mail  ("KKK e-mail").)  Plaintiff, however, was unsure who
printed the e-mail or left it in the locker room, and did not recognize any of its senders or recipients.
(01/16/12 Frazier Dep. 105:8–20, 106:1–24, 107:1–19.)  Frazier himself did not bring the e-mail to
Nejad's attention, but believes that someone else did.  (Id. at 107:20–24, 108:1–7, 109:8–11.)

At her deposition, Nejad testified that during his term of employment at Ottens, Frazier had
also contacted her regarding an alleged "tension" between him and Fabioneri.  (Nejad Dep. 62:5–17.)
Specifically, Frazier told Nejad that felt as though Fabioneri was "micromanaging" and "needling"
him.  (Id. at 62:8.)  However, according to Nejad, Frazier never informed her that he believed
Fabioneri's actions were attributable to his race.  (Id. at 61:2–8.)

On October 9, 2008, Frazier met with Nejad and Fabioneri in the Human Resources
Department for the first time to discuss the alleged tension.  (01/16/12 Frazier Dep. 62:1–24,
63:1–24; Defs.' Mot. Summ. J. 5; Pl.'s Resp. Opp'n ¶ 18.)  During this meeting, Frazier apparently
confronted Fabioneri and asked him if he "had a problem" with Frazier's race, but did not recall
Fabioneri's answer.  (01/16/12 Frazier Dep. 61:18–19, 64:1–3.)  Later that same day, Frazier's
employment position at Ottens was terminated.  (Id. at 65:1.)  At this time, Nejad gave Frazier an
official letter of termination, which stated that he was being terminated for failure to adhere to
company rules and work satisfactorily with his boss.  (Id. at 65:1–4; Defs.' Mot. Summ. J., Ex. 6,
10/09/08 Charles Frazier Termination Letter ("Frazier Termination Letter").)  The decision to
terminate Frazier's employment was allegedly jointly made by Nejad, Fabioneri, and two other
Ottens employees.  (Defs.' Mot. Summ. J., Ex. 7, Defs.' Resp. to Pl.'s First Set of Interrogatories
("Resp. Interrog.") 4–5.)  It is uncontested that Defendant Jones played no role in the decision to

terminate Frazier.  (Defs.' Mot. Summ. J., Ex. 9, Deposition of Chuck Jones ("Jones Dep.") 14:20–23; Pl.'s Resp. Opp'n 14.)

Plaintiff initiated the instant action by filing a Complaint in this Court on June 17, 2011, asserting two counts against Defendants: (1) retaliation against Plaintiff for his alleged complaints of racial harassment, in violation of 42 U.S.C. § 1981 (Count I), and (2) racial discrimination related to his termination and a racially hostile work environment, also in violation of 42 U.S.C. § 1981 (Count II).  Defendants filed their Answer on August 16, 2011.  Defendants subsequently filed the instant Motion for Partial Summary Judgment on February 3, 2012, in which they moved for summary judgment on Plaintiff's hostile work environment claim and all individual liability claims asserted against Defendant Jones.  Plaintiff filed his Response in Opposition on February 15, 2012, and Defendants replied on March 6, 2012.  On February 24, 2012, the parties had stipulated to the fact that all liability claims asserted against Defendant Jones individually should be dismissed.  The Court entered an order approving the stipulation on February 28, 2012.  The Court will now consider the remainder of Defendants' Motion for Partial Summary Judgment.

## II.   STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

On summary judgment, it is not the court's role to weigh the disputed evidence and decide

which is more probative, or to make credibility determinations.  Boyle v. Cnty of Allegheny, Pa., 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co., Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).  If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 255.

Although the moving party bears the initial burden of showing an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's case." Id. at 325.  Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts."  Matsushita Elec., 475 U.S. at 586.  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  Anderson, 477 U.S. at 249.  Summary judgment may be granted when "the evidence is merely colorable . . . or is not significantly probative."  Id. at 249– 50 (citations omitted).

## III.    DISCUSSION

In the instant case, Plaintiff asserts that he was subjected to a racially hostile work environment in violation of 42 U.S.C. § 1981 due to Defendants' various discriminatory statements

6

and actions in the Ottens workplace.  (Pl.'s Resp. Opp'n 10.)  Defendants aver that the evidence supporting Plaintiff's claims is too general to constitute an actionable hostile work environment claim, and that they therefore are entitled to summary judgment as a matter of law on this point. (Defs.' Mot. Summ. J. 8.)

Under § 1981, "all persons" are guaranteed the same rights as white citizens to "make and enforce contracts." 42 U.S.C. § 1981.[1]  The Third Circuit has held that the "make and enforce" language of the statute encompasses actions based on a hostile work environment.  Manatt v. Bank of Am., N.A., 339 F.3d 792, 797 (3d Cir. 2003) ("We now join every other circuit to have decided this issue and hold that the congressional amendment to § 1981 evinced congressional intent to permit hostile work environment claims under § 1981.").  The Third Circuit has also found that this statutory section imposes liability on both corporate employers and individual employees that "intentionally cause[d] an infringement of rights protected by Section 1981, regardless of whether the [corporate employer] may also be held liable." Cardenas v. Massey, 269 F.3d 251, 268 (3d Cir. 2001) (citing Al-Khazraji v. St. Francis Coll., 784 F.2d 505, 518 (3d Cir. 1986); Santiago v. City of Vineland, 107 F. Supp. 2d 512, 540–41 (D.N.J. 2000)) (internal quotations and citation omitted).

To establish a prima facie case of discrimination based on a hostile work environment under § 1981, a plaintiff must show:

---

[1] The statute provides, in relevant part:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).

> (1) [T]hat he or she suffered intentional discrimination because of race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability.

Ocasio v. Lehigh Valley Family Health Ctr., 92 F. App'x 876, 879 (3d Cir. 2004) (citing Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1081 (3d Cir. 1996)).  In order to survive a motion for summary judgment, a plaintiff must be able to satisfy all five elements.  See Ogden v. Keystone Residence, 226 F. Supp. 2d 588, 602 (M.D. Pa. 2002) (granting summary judgment in defendant's favor because plaintiff failed to fulfill three out of five elements of the claim).  Moreover, when assessing such legal actions, courts must consider the totality of the circumstances surrounding the plaintiff's claims.  See Cardenas, 269 F.3d at 260.

### 1.    Intentional Discrimination Because of Race

In analyzing hostile work environment claims, "[t]he critical issue . . . is whether members of one [ ] race are exposed to disadvantageous terms or conditions of employment to which members of [ ] [an]other [ ] race are not exposed."  Ogden, 226 F. Supp. 2d at 598 (citing Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)) (further citation and internal quotations omitted).[2]  The Third Circuit has recognized that "there are no talismanic expressions which must be invoked as a condition-precedent" to making a successful claim of intentional discrimination, so long as the words "could be seen as conveying the message that members of a particular race are disfavored and . . . are, therefore, not full and equal members of the workplace."  Aman, 85 F.3d at 1083.

---

[2] "[W]hen it comes to a claim for a hostile work environment, the substantive legal analysis under § 1981 is indistinguishable from that under Title VII."  Ogden, 226 F. Supp. 2d at 604.  Therefore, while several cases cited throughout this Memorandum address claims brought under Title VII, the legal analysis utilized in those cases is equally applicable to the instant dispute before this Court brought pursuant to § 1981.

In the instant case, it is clear from the record that there is a question of fact as to whether discrimination was occurring at Ottens throughout Plaintiff's employment there.  For example, management's frequent use of the phrase "you people" may indicate some form of animosity in the workplace.  (See 01/16/2012 Frazier Dep. 32:2–12, 51:4–6.)  Defendants aver that, even if there was some form of ongoing discrimination at Ottens, such comments were general and not directed at Frazier, and therefore no question of fact remains that Defendants did not discriminate against him on account of his race.  (Defs.' Mot. Summ. J. 8, 9.)  A further analysis of the record, however, indicates that the issue is not so clear cut, and that a reasonable jury could in fact find that the alleged discrimination was intentionally directed at Plaintiff because of his race.  For example, it cannot be definitively stated that an Ottens employee did not leave the highly offensive KKK e-mail on a bench in a locker room frequented by Frazier for the purpose that he find it there.  Other alleged incidents appear to bear an even more direct correlation to Frazier.  Fabioneri's insensitive joke about tropical birds and his questions about the high crime rate of African-Americans were directly addressed to Frazier and/or made in his presence.  Thus, when considering the totality of the circumstances surrounding Plaintiff's claims, several of the alleged comments and incidents could collectively be interpreted "as conveying the message" that members of the African-American race were "disfavored" at Ottens and therefore not considered "full and equal members of the workplace." Aman, 85 F.3d at 1083.  The Court therefore finds that the first element of a hostile work environment claim could be satisfied under the circumstances present in this case.

### 2.    Pervasive and Regular Discrimination

In order to constitute an actionable hostile work environment claim, the Supreme Court has held the conduct at issue must be "severe and pervasive" enough to "amount to a change in the terms and conditions of employment."  Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).  Isolated

and sporadic incidents over a long period of time are insufficient to create a hostile work environment.  Ocasio, 92 F. App'x at 880 (citing Durham Life Ins. Co. v. Evans, 166 F.3d 139, 155 (3d Cir. 1999)).  Moreover, "simple teasing" and "offhand comments" do not amount to discriminatory changes in the terms and conditions of employment.  Faragher, 524 U.S. at 788 (further citation and internal quotation omitted).

Here, Defendants allege that Plaintiff's claims are too generalized in nature and occurred too infrequently to constitute legally actionable pervasive discrimination.  (Defs.' Mot. Summ. J. 8.) Defendants also cite to the fact that Plaintiff could not specify precise dates and times for the alleged derogatory incidents. (Id. at 7–8.)  Plaintiff, on the other hand, avers the comments occurred with regularity, rose above the level of simple teasing and offhand remarks, and that Fabioneri's specific use of the racial slur "n-----" had the effect of "chang[ing] the atmosphere, environment and culture of [the] workplace from positive to poisonous."  (Pl.'s Resp. Opp'n 11.)

It is true that generalized and isolated comments are insufficient to constitute pervasive and regular discrimination.  Harris v. SmithKline Beecham, 27 F. Supp. 2d 569, 578 (E.D. Pa. 1998). Thus, several of Plaintiff's alleged incidents of discrimination, when viewed in isolation, appear to be legally insufficient to make out a successful hostile work environment claim. For example, the Third Circuit has previously found the use of the generalized phrase "you people" to constitute the type of "offhanded comment" that is not legally actionable.  See Woodard v. PHB Die Casting, 255 F. App'x 608, 609–10 (3d Cir. 2007) (further citation omitted).  Moreover, Fabioneri's comments about the high African-American crime rate and insensitive joke about tropical birds were isolated in time, and do not appear to rise to the level of "severe and pervasive" conduct that was "extreme [enough] to amount to a change in the terms and conditions" of Frazier's employment.  Faragher, 524 U.S. at 788 (further citation omitted).

10

The Court is admittedly more troubled by Defendant Fabioneri's use of the racial slur "n-----" and Frazier's finding of an e-mail discussing African-Americans and the KKK at the Ottens workplace.  This racial epithet and organization have a long-standing racist connotation against African-Americans in American society.  Mere reference to one of the two, however, does not automatically equate to a successful hostile work environment claim, as a plaintiff must still show that the asserted conduct was severe, pervasive, and amounted to a change in the terms and conditions of his employment.  See Woodard, 255 F. App'x at 610.

In regard to Fabioneri's use of the racial slur, Plaintiff cites to Mintz v. Dist. of Columbia, No. Civ.A.00-0539, 2006 WL 1518954, at *3 (D.D.C. May 30, 2006), which recognized that, "the use of the [term] 'n-----' [can] be so offensive that it need not happen often to create a hostile work environment."  Id. at *3 (further citation omitted).  Aside from the fact that Mintz is not binding authority on this Court,[3] in that case, the defendants had made numerous racial slurs directly addressed to the plaintiff over a short, three-month period.  Id. at *1–2.  Other courts within this Circuit have held that, "[f]or racist comments, slurs and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racist slurs, there must be a steady barrage of opprobrious racist comments."  Boyer v. Johnson Matthey, Inc., No. Civ.A.02-8382, 2005 WL 35892, at *17 (E.D. Pa. Jan. 6, 2005) (internal citation omitted).  Moreover, the Third Circuit has held that comments merely overheard but not specifically directed at a plaintiff are not severe or pervasive enough to constitute an actionable hostile work environment claim.  See Caver, 420 F.3d at 263.

In this case, Frazier only points to Fabioneri's single use of the highly offensive term, and

_____

[3] On this point, Plaintiff also cites to several cases within the Second, Fifth, Sixth, Seventh, Eighth, and Ninth Circuits, but none within the Third Circuit's jurisdiction.

admits that he "came in at the tail end" and was unsure whom the comment was addressed to or made about.  (Frazier Dep. 45:18–24, 46:1–3, 47:3–4.)  As such, it appears that, standing alone, Fabioneri's use of the word "n----- " in this context would be insufficient to support a hostile work environment claim.

As to Plaintiff's finding of the e-mail discussing African-Americans and the KKK, the Court looks to the Third Circuit's opinion in Caver v. City of Trenton,  420 F.3d 243 (3d Cir. 2005).  In Caver, the plaintiff brought a hostile work environment claim against his former employer based on a series of alleged discriminatory incidents, one of which was his supervisor's comment that "it was okay to be in the KKK."  Id. at 263.  The Third Circuit found that this comment did not give rise to a hostile work environment, partially based on the fact that it was not directly addressed to the plaintiff himself.  Id. at 263.  In so holding, the court stated that: "We note first that no racist comment, written or spoken, was ever directed at [plaintiff] himself. . . . It goes without saying that we strongly disapprove of the use of racial epithets . . . but the fact that inappropriate comments were made is not enough on its own to sustain a cause of action for a hostile work environment."  Id. at 263, 263 n.16.

In light of the Third Circuit's holding in Caver, it is unlikely that in the instant case, Frazier's claim of a racially hostile work environment based on the KKK e-mail alone would survive a motion for summary judgment.  While the locker room was a place of public use that was frequented by Plaintiff such that one could anticipate his finding and reading of the derogatory e-mail there, the record is devoid of evidence indicating who left the e-mail in the locker room and whether it was left with the intent that Frazier find and read it. (01/16/12 Frazier Dep. 106:3–18, 107:14–19, 108:14–24.)  Frazier was not the only African-American employed at Ottens, and admits that he did not recognize the sender and/or recipients of the e-mail. (Id. at 36:19–20, 55:19–20, 72:22–23,

12

107:10–13.)  Thus, similar to the plaintiff in <u>Caver</u>, a reasonable jury here could find that Frazier has failed to show that the racially discriminatory e-mail was directed toward him.

However, although it is doubtful that any of these comments and actions taken at Ottens— when viewed independently from one another—would be legally sufficient to support a hostile work environment claim, the law requires the Court to consider these alleged incidents of discrimination collectively to determine if, in the aggregate, they were severe and pervasive enough to alter the conditions of Frazier's employment.  <u>Durham Life Ins. Co.</u>, 166 F.3d at 155 (3d Cir. 1999) ("[I]t is settled law that courts should not consider each incident of harassment in isolation, . . . [but] must evaluate the sum total of abuse over time."); <u>see also</u> <u>Abramson v. William Paterson Coll. of N.J.</u>, 260 F.3d 265, 279–80 (3d Cir. 2001) ("No one event alone stands out from the rest, but all of the events could be found to aggregate to create a[ ] [hostile] environment[.]").  Here, it is possible that a reasonable jury could find that all of these alleged events, when taken as a collective whole, constitute regular and pervasive discrimination at Ottens.  As such, the Court will assume without deciding that Plaintiff could satisfy the second element of a racially hostile work environment under these circumstances.

### 3.    Detrimental Effect of the Alleged Discrimination

The Court next considers whether the alleged discriminatory conduct at issue was detrimental.  The third element of a hostile work environment claim dictates that the plaintiff must have found the conduct to be abusive, while the fourth element provides that a reasonable person in the plaintiff's position would have been detrimentally affected by the same conduct.  For practical purposes, the Court considers these two elements jointly.

In determining whether a hostile work environment exists, courts must look to a totality of the circumstances to ascertain whether the conduct was "'severe enough to affect the psychological

stability of a minority employee.'" Ocasio, 92 F. App'x at 880 (quoting Andrews v. City of Phila., 895 F.2d 1469, 1482 (3d Cir.1990)).  While a plaintiff need not provide evidence of *actual* physical, psychological, or economic harm to persevere on such a claim, any conduct affecting his well-being is relevant to such an inquiry.  See Ogden, 226 F. Supp. 2d at 599 (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21–22 (1993)) (providing that the statute "comes into play before the harassing conduct leads to a nervous breakdown").  The Supreme Court has provided several factors for courts to consider in making such a determination, including "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23.

During his deposition, Plaintiff stated numerous times that he believed Defendants' actions were discriminatory and harassing. (See 01/16/12 Frazier Dep. 31:16–17, 32:7–8, 33:20–21, 35:1, 52:12.) While the Court has doubts as to whether Defendants' comments here were more than "mere offensive utterances" or were severe enough to unreasonably interfere with Frazier's work performance, there simply is not enough evidence before it for summary judgment purposes to conclusively determine that their conduct did not have a detrimental effect on Frazier.  Therefore, the Court will once again assume without deciding, for purposes of this Motion only, that Plaintiff could satisfy the third and fourth elements of a hostile work environment claim at trial, such that summary judgment on this point would be premature.

### 4.    Respondeat Superior Liability

The final element of a hostile work environment claim is the presence of respondeat superior liability.  "Employer liability depends upon whether the person charged with creating the hostile environment is the plaintiff's supervisor or merely the plaintiff's coworker." Ogden, 226 F. Supp. 2d at 600.  An individual is considered a "supervisor" if he has the ability "to hire and fire, and to

set work schedules and pay rates." <u>Faragher</u>, 524 U.S. at 803.

Here, there is no dispute that Defendant Fabioneri was Frazier's direct supervisor. Moreover, Defendant Nejad, as the Director of Human Resources at Ottens, certainly had the authority to hire and fire employees. She is, in fact, the individual whose signature appears on Frazier's official letter of termination. (<u>See</u> Frazier Termination Letter.) As such, it is evident that respondeat superior liability is present here,[4] and that the final element of a hostile work environment claim is likewise satisfied under these circumstances.

## IV.    CONCLUSION

For the aforementioned reasons, the Court finds that a reasonable jury could find that Plaintiff could successfully make out a prima facie case of a racially hostile work environment under these circumstances. Defendants' Motion for Partial Summary Judgment, therefore, is denied.[5]

An appropriate Order follows.

---

[4] As to Defendant Jones, all claims asserted against him individually have been dismissed from suit. <u>See</u> Footnote 5 below.

[5] In their Motion, Defendants also move for summary judgment on all claims individually asserted against Defendant Jones. After deposing several individuals and reviewing the documents exchanged during discovery, Plaintiff chose not oppose Defendants' Motion on these grounds. The parties stipulated to Jones' dismissal from this suit on February 24, 2012 (Docket No. 14), and the Court entered an Order approving the stipulation on February 28, 2012 (Docket No. 15). Therefore, Defendants' Motion for Partial Summary Judgment as to the individual liability of Defendant Jones is denied as moot.